UNITED STATES of America, Appellee,

v.

Sergio CHAMORRO a/k/a Sergio Hernandez, Appellant.

No. 81–1815.

United States Court of Appeals, First Circuit.

Argued June 3, 1982.

Decided Aug. 13, 1982.

Certiorari Denied Nov. 29, 1982.

See 103 S.Ct. 462.

Raymond E. Gillespie, Boston, Mass., for appellant.

Paul F. Healy, Jr., Asst. U. S. Atty., Boston, Mass., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and PETTINE,* District Judge.

BOWNES, Circuit Judge.

Defendant-appellant, Sergio Chamorro, appeals his conviction, by a jury, of knowingly causing an explosive device to be sent through the mail with the intent to injure, in violation of 18 U.S.C. § 1716(h). At the time of the offense, Chamorro was incarcerated at Walpole Prison in Massachusetts. The appellant raises two issues on appeal. First, Chamorro claims that the trial court erred in denying his motion to suppress an

* Of the District of Rhode Island, sitting by desig-    nation.

address label seized in a search of his prison cell. Second, Chamorro contends that the district court erred in denying his motion for a mistrial, when a witness's nonresponsive testimony indicated that Chamorro had previously been convicted of intent to murder.

*The Facts*

On May 4, 1981, the United States Postal Service delivered a package addressed to Pablo Santiago at his restaurant. The package contained a hollowed-out book with a bomb inside it which exploded when the book was opened, injuring two people.

The addressee of the explosive package, Pablo Santiago, had known Chamorro for more than ten years. Santiago had testified against him in a previous trial in 1978 when Chamorro was convicted of intent to murder and sent to Walpole Prison. Santiago testified that, after the 1978 trial, he had received threatening letters; one letter had Chamorro's palm print, and another was signed by him.[1]

Estaban Velez, an acquaintance of Chamorro, testified that on a May 2 visit at Walpole Prison, Chamorro asked Velez to take a television set out of Walpole for him and mail a package which was contained in the set. Velez testified that he took the television set from the prison and mailed the package contained in it from the Woburn Post Office. Two days later, May 4, a package mailed from the Woburn Post Office was delivered to Santiago's restaurant and the book it contained exploded when opened.

There was further evidence at the trial that the materials the bomb was made of were available in Walpole Prison and the hollowed-out book was the same volume of a book the Sharon[2] Library had either sold or sent to Walpole Prison. The defendant's finger and palm prints were found on the bomb package and on pages of the book.

On May 11, 1981, Officer McGuiness of Walpole Prison was instructed to search Chamorro's cell with the assistance of Officer Wisz. The officers were aware that Chamorro was being investigated by the United States Attorney's office and the Postal Department in connection with the May 4 bombing. McGuiness testified that he was ordered to search for any contraband. Wisz testified that McGuiness ordered him to search for "electrical type things or anything that could be used in making a bomb." Chamorro was not present during the search. While searching Chamorro's locker, the officers discovered an electrical dictionary. In examining it, a filled-out address label was found. McGuiness testified: "I did not understand why a return address label, or an address label would be in the room." Finding the label suspicious, McGuiness seized it. Later, it was learned that the label bore the same nonexistent Boston address as the return address label found on the package containing the book bomb. A document analyst matched the lettering on both labels with the typeface used at Walpole. The inks on the two labels were also similar.

*The Motion to Suppress*

Appellant contends that the search of his cell and the seizure of the label were unreasonable and violated his fourth amendment right to privacy. The basic issue is what, if any, fourth amendment protection an inmate has in his cell and contents.

■ It is now well settled that inmates do not forfeit all constitutional protections by reason of their confinement in prison. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979);[3] *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Meachum v. Fano*, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Wolff v. McDonnell*, 418 U.S. 539,

---

**1.** Chamorro introduced testimony by Elizabeth McCarthy, a handwriting expert, that the writing on the letters was not his.

**2.** A town near Walpole.

**3.** We recognize, of course, that *Wolfish* dealt with pretrial detainees. Although the rights of convicted prisoners would not necessarily be coextensive with those awaiting trial, limitations on the constitutional rights of detainees would *a fortiori* apply to convicted prisoners.

555–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974), *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). It is also recognized that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948); *see Wolfish*, 441 U.S. at 545–46, 99 S.Ct. at 1877. An important consideration is that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators, therefore, should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878; *see Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. at 128, 97 S.Ct. at 2539; *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Meachum v. Fano*, 427 U.S. at 228–29, 96 S.Ct. at 2540.

The Supreme Court has yet to decide whether and to what extent an inmate's privacy interest in his cell is protected by the fourth amendment. In dicta, in *Lanza v. New York*, 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962), the Court stated:

> But to say that a public jail is the equivalent of a man's "house" or that it is a place where he can claim constitutional immunity from search and seizure of his person, his papers, or his effects, is at best a novel argument. ... Yet, without attempting either to define or to predict the ultimate scope of the Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day. (footnote omitted).

In *Wolfish*, the scope of prisoners' fourth amendment protection was left open. The Court assumed *arguendo* that a diminished expectation is retained, but found the challenged searches reasonable and thus constitutional. 441 U.S. at 556–57, 99 S.Ct. at 1883.

Prior to *Wolfish*, several courts had grappled with the vexing question of what, if any, fourth amendment protection an inmate retains in his cell. Most notable of such cases is *Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975), *aff'd on reh'g*, 545 F.2d 565 (7th Cir. 1976) (in banc), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). In that case, an inmate claimed that in a random, general "shakedown" of several cells, his trial transcript was taken from his cell. In an opinion written by then-Circuit Judge Stevens, the Seventh Circuit reversed the trial court's ruling granting the government's motion for summary judgment. The court took issue with several Ninth Circuit cases and held: "We are persuaded, however, that the possible application of some measure of Fourth Amendment protection within a prison context may not be summarily rejected." *Id.* at 1315. The opinion traced recent prison litigation, noting that inmates retain diminished protection of, at least, the first and fourteenth amendments. Judge Stevens wrote:

> Respect for the dignity of the individual compels a comparable conclusion with respect to his interest in privacy. Unquestionably, entry into a controlled environment entails a dramatic loss of privacy. Moreover, the justifiable reasons for invading an inmate's privacy are both obvious and easily established. We are persuaded, however, that the surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody.

*Id.* at 1316.

In a recent decision, the Eighth Circuit held that "[p]risoners enjoy at least minimal fourth amendment protection in cell-search situations." *Olson v. Klecker*, 642 F.2d 1115, 1116 (8th Cir. 1981). *See also United States v. Stumes*, 549 F.2d 831, 832 (8th Cir. 1977) (per curiam), in which the

court recognized that, though inmates do not retain the same measure of protection afforded nonincarcerated individuals, they do not forfeit all their fourth amendment rights with respect to their cells.

In a case where an inmate's cell was searched without a warrant and documentary evidence of income tax evasion was discovered, the Ninth Circuit, using the standard of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), held that a prisoner did not have a reasonable expectation of privacy in his cell and that, therefore, the search did not violate the fourth amendment. *United States v. Hitchcock*, 467 F.2d 1107, 1108 (9th Cir. 1972) (per curiam), *cert. denied*, 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973). *See also United States v. Ready*, 574 F.2d 1009, 1014 (10th Cir. 1978), where the court upheld a cell search and seizure of evidence of tax evasion holding that a warrant was not required "[i]f the search procedure is routine, and reasonably designed to promote the discipline of the institution . . . ."

This circuit has not ruled expressly on the issue. The District Court of New Hampshire held that no constitutional question was raised by searches and seizures effected during a prison-wide lockup because the cell block area was not constitutionally protected. *Hoitt v. Vitek*, 361 F.Supp. 1238, 1255 (D.N.H.1973), *aff'd*, 497 F.2d 598 (1st Cir. 1974). In a prison mail case, the District Court of Rhode Island stated that "the right to be free from unreasonable searches and seizures is one of the rights retained by prisoners subject, of course, to such curtailment as may be made necessary by the purposes of confinement and the requirements of security." *Palmigiano v. Travisono*, 317 F.Supp. 776, 791 (D.R.I.1970).

▇ We now rule that an inmate retains some residuum of fourth amendment protection.[4] The harder question remains:

What is the scope of this protection? We do not think that a hard and fast definition can or should be made. Rather, the answer turns on the fact situation; a case-by-case determination is necessary. We turn to the question of whether defendant's fourth amendment· rights were violated by this search.

▇ First, we dispatch appellant's argument that a warrant was required to conduct this search. The Supreme Court in *Bell v. Wolfish* held that unannounced searches of inmate living areas at irregular intervals did not require a warrant. 441 U.S. at 557, 99 S.Ct. at 1883. In a case remarkably similar to the case before us, the Eighth Circuit held that no warrant was required to seize an inmate's typewriter from his cell. There, the authorities had probable cause to believe that the inmate was sending threatening letters to adverse witnesses. *United States v. Stumes*, 549 F.2d at 832. We have found no cases suggesting that a warrant may be necessary to search a prisoner's cell. Whatever residuum of fourth amendment protection a prisoner has, it does not include the right to insist that a warrant be obtained before a search can be made. Such a requirement would handcuff prison officials in maintaining security and afford a prison cell the same sanctity as a home. We expressly reject appellant's contention that because the search here was directed at a particular inmate, as opposed to a random one, a warrant was required.

The courts are generally in accord that what remains of fourth amendment protection behind prison gates is the prohibition of unreasonable searches and seizures. *Bonner v. Coughlin*, 517 F.2d at 1317; *United States v. Lilly*, 576 F.2d 1240, 1244 (5th Cir. 1978), *reh'g denied*, 599 F.2d 619 (1979); *United States v. Savage*, 482 F.2d 1371,

---

4. Judge Campbell prefers not to join in the broad assertion that an inmate retains a "residuum of fourth amendment protection" nor in the later assertion that a "case-by-case determination is necessary." Rather, in the absence of any controlling Supreme Court precedent on this issue, he would simply rule that *if* an inmate retains any right under the fourth amendment to object to searches of his cell, that right could be no more extensive than that described herein. Thus, even were such protection to exist, appellant could not prevail here for the reasons amply stated by the court in this opinion.

1372 (9th Cir. 1973); *United States v. Hinckley*, 525 F.Supp. 1342 (D.D.C.1981); *O'Connor v. Keller*, 510 F.Supp. 1359 (D.Md. 1981). The reasonableness of a search, of course, must be determined in light of the prison setting. In deciding the validity of body cavity searches, the Supreme Court stated:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884 (citations omitted).

■ We find, under the circumstances, that the search of Chamorro's cell was reasonable. The search was conducted for a valid security reason. Prison officials were aware that defendant was under investigation in connection with the May 4 explosion. They knew that he was suspected of making a bomb; defendant's cell was the logical place of manufacture. With this knowledge, the prison officials would have been grievously remiss in their duty if they had not ordered a search of defendant's cell. Surely, prison security is threatened when inmates are able to make bombs in their cells. This was not a search conducted solely for the purpose of gathering evidence of a crime. One officer testified that he was searching for any kind of contraband; the other was looking for "electrical type things or anything that could be used in making a bomb." General contraband searches have uniformly been upheld. *See Wolfish*, 441 U.S. at 557, 99 S.Ct. at 1883. It follows that a search for specific contraband—materials to make a bomb—is also reasonable. There is no evidence to suggest that the search was conducted merely to harass the defendant. The prison officials had reasonable grounds for suspecting that Chamorro was engaged in dangerous criminal activity. The search was a reasonable, if not manda-tory, response to a threat to prison security. We see no validity to appellant's argument that because a search was directed at him and he was not present, it was unreasonable. *Wolfish* specifically held that a prisoner's presence during a cell search is not necessary. 441 U.S. at 556–57, 99 S.Ct. at 1883.

Nor can we find that the search was overly intrusive. Certainly, searching the defendant's locker and leafing through his books were not unreasonable. Books are frequently used as hiding places for contraband. *See Wolfish*, 441 U.S. at 551, 99 S.Ct. at 1880. Moreover, in this case, appellant was specifically suspected of placing a bomb in a book. There are no allegations that appellant's personal papers, mail, or legal documents were searched. Thus, the need for this intrusion, the manner it was conducted, the justification for initiating it, and the place in which it was conducted were reasonable and within the boundaries imposed by the fourth amendment. *Wolfish*, 441 U.S. at 559, 99 S.Ct. at 1884.

The same "reasonableness" rationale applies to seizure of a prisoner's property. *O'Connor v. Keller*, 510 F.Supp. at 1368–69. Although the address label seized was not contraband, the defendant was under investigation for sending a bomb through the mail. A typed-in label found hidden within the pages of a book was, therefore, bound to arouse the searching officer's suspicion. As with the search, the seizure of the label was not made to harass the defendant; the label had no personal or monetary value. We find the seizure of the label was reasonable and violated no fourth amendment rights of defendant.

*Motion for Mistrial*

On the second day of the trial Pablo Santiago, the addressee of the package containing the book bomb was called to the stand. The prosecution asked him if he had ever before testified against the defendant; Santiago answered "Yes." A bench conference was called, at which defense counsel expressed a concern that the nature of the defendant's prior conviction (intent to mur-

der), if it were to become known to the jury, would be unduly prejudicial to the defendant. Defense counsel asked "to either know the nature of the next few questions or have instructions, limited instructions from the court in regard to how much can be said about that particular proceeding." The prosecution then agreed not to ask what the charge was, and to ask only if the defendant had been convicted and sent to Walpole. In the questioning that followed, Santiago was asked by the prosecution if he had been a witness for the prosecution against the defendant in a prior trial. After Santiago answered "Yes," the prosecutor asked: "Was he convicted?" Santiago answered: "He was." Defense counsel objected and then withdrew his objection. The court then asked: "The question was, Mr. Santiago, was he convicted in that proceeding?" The witness answered: "He was convicted there, you know, for—[.]" The prosecution then asked: "He was convicted?" Santiago replied: "Intent to murder." The court, in response to defendant's objection, immediately told the jury: "He was convicted, disregard anything else." The defense moved for a mistrial; the court denied the motion and requested the prosecutor to continue with the questioning. At the close of the trial, defense counsel did not request a specific instruction on this point. The judge instructed the jury generally that anything they were told to disregard was not evidence.

Appellant now argues that Santiago's remark was so prejudicial as to constitute grounds for us to reverse the trial court's ruling denying the motion for mistrial. While the remark was unfortunate, we do not consider it cause for reversal.

 Motions for mistrials are directed primarily to the discretion of the trial court, *United States v. Pappas*, 611 F.2d 399, 406 (1st Cir. 1979), and "will not be reversed absent abuse of discretion," *id.* at 406, citing *United States v. Sclamo*, 578 F.2d 888, 891 (1st Cir. 1978). In *Pappas*, the prosecution alluded to a further "bad act" with which defendant was not charged. On appeal, we stated, "the judge did everything in his

power to eliminate any possible prejudice that might have resulted from the remark by not only sustaining the defense counsel's objection, but subsequently telling the jury to disregard the remark." 611 F.2d at 406. *See United States v. Bosch*, 584 F.2d 1113, 1118 (1st Cir. 1978).

 Here, the judge immediately instructed the jury to disregard all but the fact that appellant was convicted. She then moved the case on quickly, thereby lessening the time the jurors had to reflect on the offending testimony. Defense counsel apparently did not want the issue brought up again and thus asked for no specific instructions. The judge in her final instructions told the jury that what it was told to disregard was not evidence. Any prejudicial effect of the remark was efficaciously dispelled. The district court did not err in denying the motion for a mistrial.

*Affirmed.*