STATE

v.

Dennis WILMOT.

No. 80–512–C.A.

Supreme Court of Rhode Island.

June 16, 1983.

Dennis J. Roberts II, Atty. Gen., Joseph Ippolito, Jr., Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Janice M. Weisfeld, Asst. Public Defender, for defendant.

## OPINION

MURRAY, Justice.

The defendant, Dennis Wilmot, appeals his Superior Court conviction for assault with a dangerous weapon. On May 25, 1979, a Providence County Grand Jury returned an indictment against the defendant, a maximum security inmate at the Adult Correctional Institutions (ACI), charging him with assault with intent to murder in a February 28, 1979 attack on Correctional Officer David Thornton. The defendant was tried in May 1980 before a justice of the Superior Court and a jury. The jury found him guilty of the lesser included offense of assault with a dangerous weapon. The defendant filed a motion for a new trial, which the trial justice denied. He now appeals from the judgment of conviction entered below. We affirm.

On February 28, 1979, Correctional Officer David Thornton began his shift at approximately 7 a.m. in the maximum security section at the ACI. He was on duty in the portion of the South State cellblock wing which housed the three-tier block known as JKL. Thornton unlocked the main bar on each of the three tiers, which opens all of the cells simultaneously, enabling inmates to come out of their cells at their leisure. As he descended the stairs from J tier (the top level) he was met by an inmate he knew. He later identified the inmate as Dennis Wilmot. Thornton testified that Wilmot struck him on the right side of his neck and then slashed the left side of his throat and face. He stated that two other inmates were present at the time of the assault. One of the other inmates helped him into the rear hall leading to the cellblock where ACI nurse Debra Colvin met him and began to administer first aid.

Once Thornton reached the rear hall, there was a commotion as other correctional officers arrived to aid and investigate. Officer John McNulty asked Thornton who had slashed him. Thornton could not remember the name of his assailant until McNulty and other officers began reading names off the count board. When he heard Wilmot's name, Thornton said, "Stop, that's him." At that point Officer McNulty went into the South State wing, found Wilmot, and took him into custody.

Immediately after the incident, Captain Stafford Quick, an administrative officer, broadcast an order for all inmates to return to their cells. At approximately the same time several officers began a search for weapons. They found a green-handled shank [1] near the stairway leading to the inmates' dining room. A second, red-handled, shank was found in a utensil box in the inmates' dining room shortly after one officer had observed Dennis Wilmot pause at the box.

Captain Quick also called the State Police. Two State Police officers arrived promptly in the rear hall of maximum security and learned that Thornton had identified Wilmot as his assailant. At approximately 8 a.m. they gave this information to Detective David Trainor of the State Police

---

1. A shank was described by witnesses as a homemade weapon made of plastic melted from a toothbrush or plastic knife, with razor blades inserted and a handle wrapped with black surgical tape.

Bureau of Criminal Identification, who subsequently searched Wilmot's cell.

Detective Trainor testified that he searched defendant's cell accompanied by Matthew Gill, an ACI administrator, and one or two corrections officers. He found several items, which he took possession of, including some bloodstained clothing and bedding, several double-edged razor blades, and a roll of black tape. The tape was sent to an F.B.I. laboratory where it was matched with the tape wrapped around the shanks.

In May 1979 a grand jury charged defendant by indictment with assault with intent to murder. He was arraigned on June 6, 1979. In November 1979, December 1979, and January 1980, defendant moved to dismiss the indictment pursuant to Rule 48(b) of the Superior Court Rules of Criminal Procedure. He claimed that the state had caused unnecessary delay in bringing him to trial because of its failure to provide discovery materials. The trial justice denied each motion.

The defendant was tried before a jury in May 1980. Before trial he moved to suppress from admission into evidence the roll of black tape and the clothing seized from his cell by State Police detectives on February 28, 1979. The defendant argued that the warrantless search of his cell and the seizure of these items violated his rights under the Fourth Amendment to the United States Constitution. The trial justice denied the motion and these items were introduced into evidence through the testimony of the FBI agent who tested them. The defendant was convicted of the lesser included offense of assault with a dangerous weapon.

On appeal, defendant raises two issues. First, he contends that the trial justice abused his discretion in denying defendant's Rule 48(b) motion to dismiss. Second, he argues that the trial justice erred in denying his motion to suppress the roll of tape that he maintains was illegally seized from his cell at the ACI.

## I

The defendant describes a long series of delays and continuances which he claims manifests the state's unnecessary delay in bringing him to trial. Shortly after his arraignment on June 6, 1979, defendant made a timely motion for discovery, requesting *inter alia* that the state provide him with tapes or transcriptions of the grand jury proceedings pursuant to Rule 16(a) of the Superior Court Rules of Criminal Procedure. The state responded, indicating that these tapes would be provided.

The parties agreed to continue the pretrial conference scheduled for July 17, 1979, to September 11, 1979, in order to allow sufficient time for the state to obtain and furnish the tapes.[2] On September 11, defendant still had not received any tapes. The case was continued for trial to October 15, 1979. It was continued again to October 29, then to November 13. On November 13, defendant moved to dismiss the indictment pursuant to Super.R.Crim.P. 48(b).[3] He argued that the state had caused unnecessary delay in bringing him to trial because of its repeated failure to comply with his discovery request. The trial justice denied the motion and continued the case, relying upon the state's promise to deliver the tapes immediately.

On December 10, defendant renewed his motion to dismiss as the state had not yet produced the tapes. The trial justice again denied the motion because the state promised to produce the tapes on that day. The defendant received five of the tapes and a promise that the last seven would be delivered at the end of the day.

---

2. The grand jury proceedings were concededly lengthy. They spanned a total of twelve cassette tapes.

3. Rule 48(b) of the Superior Court Rules of Criminal Procedure provides that "[i]f there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information, or complaint."

On January 14, 1980, defendant once again moved to dismiss because he had not received the remaining tapes as promised. For the first time, the prosecutor explained that the initial delay had been caused by the fact that the grand jury reporter had been "inundated with work" and had been unable to process the request for lengthy transcriptions for some time. He stated that he had received the seven remaining tapes and would furnish them to defendant immediately. The trial justice, stating that the dismissal of an indictment was a serious sanction to impose, allowed the state a few hours to produce the tapes. When it did so, he denied defendant's motion to dismiss. The trial was postponed for three weeks, but in fact the case was not reached again for trial until May 6, 1980. The defendant did not renew his motion to dismiss at that time.

As we said most recently in *State v. Anthony,* R.I., 448 A.2d 744 (1982), although Rule 48(b) was designed to implement the right to a speedy trial, it is actually far broader in scope than the constitutional guarantee. It confers upon the Superior Court the power to dismiss an indictment, information, or complaint solely because of unnecessary delay in bringing a defendant to trial. *Id.* 448 A.2d at 747. To establish a prima facie case of unnecessary delay, a defendant must show only that he or she is not responsible for any of the delay in question. *Id.; State v. Paquette,* 117 R.I. 505, 511, 368 A.2d 566, 569 (1977).[4] The state is then required to provide justification for the delay.

However, because this rule vests such discretion in the trial court, this court will not set aside a trial justice's ruling on a Rule 48(b) motion unless it constitutes a clear abuse of discretion. *State v. Anthony,* 448 A.2d at 747; *see State v. Dionne,* R.I., 442 A.2d 876, 881 (1982); *State v. Brady,* R.I., 436 A.2d 717, 717 (1981); *State v. Fortier,* R.I., 427 A.2d 1317, 1323 (1981); *State v. Paquette,* 117 R.I. at 511, 368 A.2d at 569; *State v. Grover,* 112 R.I. 649, 652, 314 A.2d 138, 139 (1974).

In the instant case, we think defendant has shown that he was not responsible in any way for the delay. We reject the state's contention that because the delay was connected to defendant's timely and valid discovery request, it was attributable to him. The record is clear that the court granted each continuance in this case because defendant had not yet received the grand jury tapes he requested. The state did not contest defendant's right to obtain these tapes; it simply failed to provide them. The state, then, must justify the delay. It must show that it was necessary and that the dilatory conduct was not contrived for the purpose of giving the state an advantage or of harassing defendant. *State v. Paquette,* 117 R.I. at 511, 368 A.2d at 569–70.

In the case before us, the prosecutor did provide a reason for the delay. He attributed it to the lengthy grand jury proceedings and the heavy workload of the stenographer. Although we think this explanation could have been more forthcoming, the trial justice found it to be adequate justification for the delay from July 1979 to January 1980. He chose not to dismiss the indictment in November and December 1979 apparently because he believed the state's promises that the discovery materials would be provided, and some of the tapes were in fact provided. He denied defendant's motion to dismiss in January 1980 because he

---

4. We reject the state's contention that we should consider prejudice to a defendant and a defendant's waiver of his right to a speedy trial on a Rule 48(b) motion to dismiss. These elements are appropriately considered in an analysis of a defendant's claim that he has been deprived of his constitutional right to a speedy trial. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *See, e.g., State v.* *Anthony,* R.I., 448 A.2d 744, 749 (1982); *State v. Fortier,* R.I., 427 A.2d 1317, 1321 (1981). However, such a claim has not been made in the instant case. As we said in *State v. Paquette,* 117 R.I. 505, 511, 368 A.2d 566, 569 (1977), on a motion under Rule 48(b), "[t]he defendant need not make a showing of prejudice, nor must he assert his right to a prompt trial * * *."

accepted the state's justification for the delay and because defendant finally received all of the requested tapes on that date. We shall not substitute our judgment for that of the trial justice. *State v. Grover,* 112 R.I. at 652, 314 A.2d at 139. Accordingly, we hold that he did not abuse his discretion in denying defendant's motion to dismiss the indictment pursuant to Rule 48(b).

We note that defendant failed to renew his Rule 48(b) motion at the start of trial. Both parties concede that neither of them requested continuances from January to May 6, 1980, but that the case simply was not reached. Because defendant did not renew his motion, the trial court never considered who was responsible for this delay or whether it was justified. Since there is no record before us, we decline to comment on or consider this period in ruling on defendant's Rule 48(b) motion to dismiss the indictment.

## II

■ The defendant's second claim of error involves the trial justice's denial of his motion to suppress evidence. The defendant argues here, as he did below, that the roll of black tape and the other items taken from his cell should have been suppressed because the State Police searched his cell and seized the evidence without a warrant in violation of his rights under the Fourth Amendment to the United States Constitution.[5] The defendant contends that the warrant clause of the Fourth Amendment fully applies to a targeted search of a prisoner's cell conducted by law enforcement officers gathering evidence of a known crime. Because this is a question of first impression in Rhode Island, we shall discuss the federal court cases that have analyzed and ruled on this issue.

It has been well-settled by the United States Supreme Court that inmates do not forfeit all constitutional guarantees because they have been convicted of crimes and confined in prison. *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447, 472 (1979).[6] *See Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 129, 97 S.Ct. 2532, 2540, 53 L.Ed.2d 629, 641 (1977); *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451, 459 (1976); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495, 501 (1974). As the Court said in *Wolff v. McDonnell,* "though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for [a] crime. There is no iron curtain drawn between the Constitution and the prisons of this country." 418 U.S. at 555–56, 94 S.Ct. at 2974, 41 L.Ed.2d at 950.

The same cases clearly recognize that a countervailing interest in the preservation of internal order and discipline and maintenance of institutional security in prisons requires that these rights be subject to restrictions and limitations. This curtailment is justified by the goals and policies underlying the penal system. *Bell v. Wolfish,* 441 U.S. at 546–47, 99 S.Ct. at 1877–78, 60 L.Ed.2d at 473; *see Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. at 125, 97 S.Ct. at 2537–38, 53 L.Ed.2d at 638; *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2975, 41 L.Ed.2d at 951; *Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804, 41 L.Ed.2d at 501. There must be a "mutual accommodation between institutional needs and objectives and the provisions of

---

5. The defendant also claims the search and seizure violated his rights under art I, sec. 6 of the Constitution of the State of Rhode Island. Because this provision provides the same protection as the Fourth Amendment, our analysis will be applicable to both.

6. Although *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 473 (1979), specifically dealt with pretrial detainees, the Court there noted that the principles articulated therein regarding continued constitutional protections in prison, as well as the limitations thereon, applied equally to convicted prisoners and pretrial detainees.

the Constitution that are of general application." *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. at 2975, 41 L.Ed.2d at 951.

However, the Supreme Court has refrained from deciding in particular the extent to which prisoners are protected by the Fourth Amendment. In *Lanza v. New York,* 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384, 387–88 (1962), the Court suggested that prisoners lack the privacy interests protected by the Fourth Amendment. However, it avoided specifically defining the scope of Fourth Amendment protection in prison: "[W]ithout attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Id.* at 143, 82 S.Ct. at 1221, 8 L.Ed.2d at 388.

In *Bell v. Wolfish, supra,* the Court addressed the constitutionality of cell searches and visual body-cavity searches. The majority opinion, however, expressly avoided ruling on the extent to which prisoners retain Fourth Amendment rights. The Court suggested that the argument could be made based on the *Lanza* reasoning "that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore the Fourth Amendment provides no protection for such a person." 441 U.S. at 556–57, 99 S.Ct. at 1883, 60 L.Ed.2d at 480. However, it then proceeded on the assumption, *arguendo,* that a pretrial detainee might retain some reasonable "expectation of privacy," diminished by "the realities of institutional confinement." *Id.* at 557, 99 S.Ct. at 1883, 60 L.Ed.2d at 480.

Courts of appeals, however, relying generally on Supreme Court precedent in related areas, have ruled that prisoners retain some remnant of Fourth Amendment rights consistent with the legitimate requirements of prison discipline and security. *See United States v. Chamorro,* 687 F.2d 1 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982); *United States v. Hinckley,* 672 F.2d 115 (D.C.Cir.1982); *Ol-*

*son v. Klecker,* 642 F.2d 1115 (8th Cir.1981); *United States v. Lilly,* 576 F.2d 1240 (5th Cir.1978) *reh. denied,* 599 F.2d 619 (5th Cir. 1979); *United States v. Stumes,* 549 F.2d 831 (8th Cir.1977); *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir.1975), *modified in part on other grounds,* 545 F.2d 565 (7th Cir.1976); *United States v. Savage,* 482 F.2d 1371 (9th Cir.1973). *See also, DiGuiseppe v. Ward,* 514 F.Supp. 503 (S.D.N.Y.1981); *O'Connor v. Keller,* 510 F.Supp. 1359 (D.Md.1981); *Palmigiano v. Travisono,* 317 F.Supp. 776 (D.R.I.1970). Several of these cases have expressly held that an inmate has a reasonable, if limited, privacy interest in his or her cell. *See, e.g., United States v. Chamorro,* 687 F.2d at 3–4; *Olson v. Klecker,* 642 F.2d at 1116; *United States v. Stumes,* 549 F.2d at 832; *Bonner v. Coughlin,* 517 F.2d at 1316–17. It should be noted, however, that there are cases to the contrary. *See United States v. Ready,* 574 F.2d 1009, 1014 (10th Cir.1978); *United States v. Hitchcock,* 467 F.2d 1107, 1108 (9th Cir.1972) (per curiam) *cert. denied,* 410 U.S. 916, 93 S.Ct. 973, 35 L.Ed.2d 279 (1973).

We are persuaded by the weight of authority which holds that an inmate retains some residuum of Fourth Amendment protection. As the court stated in *Bonner v. Coughlin,* 517 F.2d at 1316:

"[T]he view once held that an inmate is a mere slave is now totally rejected. The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual.

\*  \*  \*  \*  \*  \*

Unquestionably, entry into a controlled environment entails a dramatic loss of privacy. Moreover, the justifiable reasons for invading an inmate's privacy are both obvious and easily established. We are persuaded, however, that the surrender of privacy is not total and that some residuum meriting the protection of the Fourth Amendment survives the transfer into custody."

*Accord United States v. Chamorro,* 687 F.2d at 3; *United States v. Hinckley,* 672 F.2d at 129. Thus, we reject the state's contention that defendant has no standing to object to the search. He has a legitimate, though diminished, expectation of privacy in his cell and thus, limited protection of the Fourth Amendment, subject to the needs and exigencies of the prison environment. *United States v. Hinckley,* and *United States v. Chamorro,* both *supra. See State v. Farrell,* R.I., 443 A.2d 438, 440 n. 4 (1982); *State v. McKee,* R.I., 442 A.2d 440, 442 (1982). It remains for us to determine the scope of this protection.

■ Although a prisoner retains some measure of Fourth Amendment protection, it does not rise to the level possessed by unincarcerated members of society. *United States v. Stumes,* 549 F.2d at 832; *Bonner v. Coughlin,* 517 F.2d at 1317. It does not include the right to insist that a warrant be obtained before authorities can search his or her cell. A cell is not a home, *Lanza v. New York,* 370 U.S. at 143, 82 S.Ct. at 1221, 8 L.Ed.2d at 388, and a prisoner has, at best, a diminished expectation of privacy therein. *Bell v. Wolfish,* 441 U.S. at 557, 99 S.Ct. at 1883, 60 L.Ed.2d at 480; *United States v. Stumes,* 549 F.2d at 832. Furthermore, to require that a warrant be obtained for a cell search would be to handcuff prison officials in maintaining order, discipline, and security. *United States v. Chamorro,* 687 F.2d at 4.

Therefore, we reject defendant's argument that a warrant was required to conduct this search. We have found no case that even suggests that a warrant may be necessary to search an inmate's cell. The Supreme Court in *Bell v. Wolfish* held that unannounced searches of inmates' cells at irregular intervals did not require warrants. 441 U.S. at 557, 99 S.Ct. at 1883, 60 L.Ed.2d

at 480. The First Circuit, in a case similar to the case before us, held that a warrant was not required to search the cell of an inmate suspected of sending an explosive device through the mail. *United States v. Chamorro,* 687 F.2d at 4.[7] In another similar case, the Eighth Circuit held that an FBI agent and a police officer did not require a warrant to seize an inmate's typewriter from his cell. *United States v. Stumes,* 549 F.2d at 832. There, the authorities suspected the inmate of sending threatening letters to a former prosecution witness. The appellate court held that the "obviation of the warrant requirement in prisons rests in part on diminished expectations of privacy." *Id.*

We see no validity in defendant's contention that a warrant should be required for a targeted search as opposed to a random or "shakedown" search, which he characterizes as "administrative." The principles that we articulate herein support the policy that prison officials must be free to search for contraband in the cells or on the persons of all inmates or those of just a single inmate believed to be harboring such material. Prison officials cannot be shackled by the requirements of obtaining a warrant each time they determine that a search for contraband is in order. The need for discipline and security in the prisons and the inmates' diminished expectation of privacy require only that every search be reasonable and not undertaken for the purpose of harassing or humiliating an inmate. *See Bell v. Wolfish,* 441 U.S. at 560, 99 S.Ct. at 1885, 60 L.Ed.2d at 482; *United States v. Lilly,* 576 F.2d at 1244.

■ Other courts generally agree that what remains of Fourth Amendment protection behind prison walls is the right to be free from *unreasonable* searches and seizures. *United States v. Chamorro,* 687 F.2d

---

7. In that case, prison officials searched the cell, aware that the defendant was being investigated in connection with the crime. They found, and seized, an address label that bore the same nonexistent address as the return-address label on the package containing the bomb. Tests showed that the ink and the typeface on the two labels matched. The trial court admitted the evidence despite the defendant's motion to suppress. The defendant's arguments on appeal were similar to those in the case before us. The court there held that the warrantless search was reasonable and did not violate the defendant's Fourth Amendment rights.

at 4; *United States v. Hickley,* 672 F.2d at 129; *United States v. Lilly,* 576 F.2d at 1244; *Bonner v. Coughlin, supra,* 517 F.2d at 1317. As the court said in *United States v. Hinckley:*

"The fourth amendment by its very terms envisions an accommodation between the right to privacy and the circumstances in which that right is asserted: 'analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' Reasonableness in turn depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference.' " 672 F.2d at 129.

Thus, assessing the reasonableness of a search in a prison requires the balancing of the individual inmate's diminished expectation of privacy against prison officials' strong interest in maintaining institutional security and preserving internal order and discipline. *See Bell v. Wolfish,* 441 U.S. at 546–47, 99 S.Ct. at 1878, 60 L.Ed.2d at 473.

The Supreme Court in *Bell v. Wolfish* articulated the Fourth Amendment's reasonableness standard in the context of prisoners' challenges to search procedures.[8] Although that standard is not capable of precise definition or mechanical application, "[i]n each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is

conducted." *Id.* at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481.

■ We find that, under the circumstances, the search of Wilmot's cell was reasonable. The search was based upon information provided by the victim of the alleged crime, which may even rise to the standard of probable cause. *See* 3 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.9 at 402–04 (1978 & 1983 Supp.).[9] It took place after homemade weapons had been found. This information led to the reasonable suspicion that defendant was involved in the crime, that he had made these weapons, and that razor blades and other materials used in fashioning the shanks were located in his cell. Furthermore, prison officials had a valid security reason for authorizing the search of Wilmot's cell. They were legitimately concerned about the possible presence of contraband there. Prison security is certainly threatened when inmates have the materials to make weapons in their cells.

Finally, the search was not unnecessarily intrusive. The detective searched the cell, including defendant's wastebasket, and his box of toiletries. This was certainly not unreasonable since the materials with which the weapons were made allegedly included a toothbrush and double-edged razor blades. The defendant did not claim that his personal papers, letters, or legal documents were searched, read, or confiscated.[10] Thus, the justification for initiating this search, and the scope, manner, and place in which it was conducted, were reasonable and within

---

**8.** The Court in *Bell v. Wolfish* applied this test to visual body-cavity searches conducted on inmates after every contact visit with a person from outside the institution and found such searches to be reasonable. The same test has been applied to cell searches. *See United States v. Chamorro,* 687 F.2d 1, 5 (1st Cir. 1982); *United States v. Hinckley,* 672 F.2d 115, 129–30 (D.C.Cir.1982).

**9.** Several state courts have upheld searches based on information provided by other prisoners, even if the information does not meet the full probable-cause test. *See, e.g., Hudson v. People,* 196 Colo. 211, 585 P.2d 580 (1978);

*People v. Elkins,* 60 Ill.App.3d 883, 18 Ill.Dec. 280, 377 N.E.2d 569 (1978); *State v. Kerns,* 201 Neb. 617, 271 N.W.2d 48 (1978).

**10.** It is only in cases involving personal papers and other written matter that some courts have found cell searches to be intrusive and therefore unreasonable. *See, e.g., United States v. Hinckley,* 672 F.2d at 130–31; *United States v. Vallez,* 653 F.2d 403 (9th Cir.1981); *Bonner v. Coughlin,* 517 F.2d 1311, 1317 (7th Cir.1975); *DiGuiseppe v. Ward,* 514 F.Supp. 503, 505–06 (S.D.N.Y.1981).

the boundaries imposed by the Fourth Amendment. *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481; *United States v. Chamorro,* 687 F.2d at 5.

Finally, we think the defendant has shown no merit in his attempt to distinguish between a search conducted by correctional officers and one conducted by State Police officers. It is clear that the State Police were acting within their jurisdiction when they arrived at the ACI to investigate a crime. *See State v. Clark,* R.I., 423 A.2d 1151 (1980); *State v. Carillo,* R.I., 407 A.2d 491 (1979). We held in those two cases that a search by police officers relying upon information from fellow inmates that the defendant was the murderer was based upon reasonable or probable cause and was therefore valid and that the evidence obtained therefrom was admissible. *State v. Clark,* 423 A.2d at 1158; *State v. Carillo,* 407 A.2d at 495. We see no reason to rule otherwise in the instant case. *See also United States v. Stumes,* 549 F.2d at 832.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment of conviction is affirmed, and the papers in the case may be remanded to the Superior Court.