STATE

v.

Jose A. ANDUJAR.

No. 2004–343–C.A.

Supreme Court of Rhode Island.

May 24, 2006.

Diane Daigle, for Plaintiff.

Marie T. Roebuck, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Jose A. Andujar (defendant), appeals his conviction in the Superior Court for criminal solicitation of murder, in violation of G.L.1956 § 11–1–9. He insists that he cannot be guilty of criminal solicitation because the intended recipient never received the soliciting instrument. Furthermore, the defendant claims he was deprived of due process when he was precluded from presenting at trial the fact of a prior acquittal while the state was permitted to introduce evidence of precisely those charges of which he had been acquitted. Finally, he claims that his legitimate expectation of privacy under both the Rhode Island and Federal Constitutions should have worked to preclude from evidence certain items seized from his prison cell in the course of a warrantless search by prison officials, as well as the fruits of an expanded search of those items. For the reasons stated herein, we vacate the judgment of conviction, order the entry of a judgment of acquittal as to criminal solicitation, and remand the case to the Superior Court for a new trial on attempted criminal solicitation.

## I

### Facts and Travel

In October 2001, defendant was arrested and charged with one count of burglary and three counts of first-degree sexual assault allegedly perpetrated against a female acquaintance, Donna.[1] The defendant was acquitted of these charges. It was while defendant awaited that criminal trial at the Adult Correctional Institutions (ACI) that the events of the present matter unfolded.

Sometime in August 2002, New York City Narcotics Detective Enrico Viola (Det.Viola) happened upon an already opened letter in his personal mailbox, located in a common mail area at his New York City multi-family residence. The letter was addressed to defendant's brother, Miguel Henriquez (Henriquez), a female acquaintance of whom also resided in Det. Viola's building. The disturbing contents of the letter, which included a reference to Westerly, Rhode Island, prompted Det. Viola to contact Det. Edward St. Clair (Det.St.Clair) of the Westerly Police Department.[2] It is undisputed that Henri-

---

1. We are using the fictitious name "Donna" to identify the victim.

2. The letter at issue read, in pertinent part, as follows:

"Dear Mike,

"What up? Listen Mike I've been thinking about what we talked about over the phone.

"I think it's better for you to just take care of that and forget about coming to see me ... because the state can put 2 and 2 together and figure out that I got a visit the same day s—— happens to this dumb b——.

"I'd rather you take care of her. Because if you do it right then I will definitely see you on the set.

"However I'm not so sure about that rat poison in the crilz s——.

"This b—— sucks d—— for crack Mike—— which means that she can be lured into a remote area and you could just throw her up into a headlock until she crokes [sic] then bounce.

"Mike come by yourself—don't f—— around n—— —by yourself! Feel it out—you'll know.

"This is a lot easier than you think—I've done it—you just have to be incognito and not tell anyone (if nobody knows—nobody

quez never received or read the letter from defendant.

Detective St. Clair received a facsimile of both the letter and envelope soon after Det. Viola's call.[3] Although the envelope designated Hector Rosario as the return addressee, and despite the fact that the letter itself was signed "Kid Nice," Det. St. Clair suspected defendant was the author. He explained at trial that these suspicions were informed by his involvement in a case that was currently pending against defendant involving Donna. He testified that he feared for her immediate safety.

Acting upon these suspicions, Det. St. Clair telephoned Special Investigator Stephen Mokler (Investigator Mokler) of the Special Investigation Unit at the ACI, whose job it was to investigate illegal activity at the prison. Detective St. Clair informed Investigator Mokler of the events surrounding his receipt of the suspect letter and of his suspicion that defendant was the true author of the letter. In fact, Investigator Mokler confirmed that Hector Rosario, the return addressee on the envelope, had been released from the ACI on March 4, 2002. It is uncontested that defendant was detained in the ACI when the letter was mailed.

This information spurred Investigator Mokler to check defendant's telephone records. He discovered that defendant had placed several calls to Henriquez. Since the ACI records all outgoing telephone calls, Investigator Mokler listened to several conversations between defendant and his brother, discovering nothing especially worrisome. Investigator Mokler then approached his superior and briefed him on

---

can tell) don't tell anybody where you are going or anything.

"This b—— lives in a town called Westerly. Before coming get on the internet and get a map of Westerly, Rhode Island.

"You might have to come up more than once so that you can know your way around better. There's a bar called the 'Shamrock' on Canal St. in Westerly. Just go there and absorb info. Find out who's who (it's your type of place). Just don't get too personal and don't tell anybody your business. Lie about who you are, say you're from Providence. Let it be known you want to get your d—— sucked. Say that you used to get busy with a girl named [Donna] who used to live on High St.

"If you meet up with [Donna] ask her if she has a nephew named [Tom].

"[Donna] is short (about your height) slim white girl—very plain looking—she's 34 yrs. old. Tell her, 'don't you remember me? I used to hang out with [Randy].'

"\* \* \*

"Start from there—have a drink.

"Only do s—— if you are 100% sure you can get away with it. Hide the crilz between your ass cheeks while you're traveling (in case you get stopped). Don't have anything else on you—no weed—nothing—don't be high! And definitely don't let any-

one know that you are related to me—under no circumstances.

"Believe me this is just as easy as what [Joe] did for you.

"Just take your time, be careful and be out ASAP.

"If s—— don't feel right—just give her the laced crilz and be out.

"Don't take any unnecessary risk; you could always come back another day.

"Mike I love you—and believe me that I will appreciate it very much if you eliminate this b—— for me. If I get convicted they already said they will sentence me as a habitual offender which means I will get life. I'm not doing life in nobody's prison. I will hang it up first. F—— that.

"Please listen to my directions and be careful—I love you and would rather die than to get you jammed up in something.

"Burn this letter. I will put separate copy of directions on white paper.

"Love Always,
Kid Nice"

According to trial testimony, "crilz" is a street term for crack cocaine.

3. Detective St. Clair eventually traveled to New York to retrieve the original copy of the solicitation letter from Det. Viola, where the two met with Henriquez to speak about defendant. Henriquez did not testify at trial.

the situation; he was told to conduct an investigation into any illegal activity.

Investigator Mokler then conducted a search of defendant's prison cell. He testified that ACI policy allows inmates' cells to be searched at any time, with or without the inmate present. Neither defendant nor Det. St. Clair was present during this search. The search yielded several papers, as well as a yellow lined legal pad. It is undisputed that Investigator Mokler never obtained a warrant either to conduct the search or to seize any item from defendant's prison cell. In September 2002, Investigator Mokler met with Det. St. Clair at the ACI and turned over both the visitors' list and the legal pad to him.

Detective St. Clair obtained a court order to collect handwriting exemplars from defendant. The defendant finally produced these samples in April 2003, under the supervision of Det. St. Clair and with the guidance of Alan Robillard (Robillard), a certified document examiner. Eventually, the exemplars and other documents—including the letter, the visitors' list and the legal pad obtained from defendant's cell, as well as another letter from defendant addressed to Donna given to Det. St. Clair by Susan, Donna's sister[4]—were turned over to Robillard for further testing. Robillard testified that a handwriting comparison analysis led him to conclude that defendant authored the solicitation letter. Further tests performed on the legal pad seized from defendant's cell, including an indented writing analysis and a torn edge examination, prompted Robillard to testify that the solicitation could only have come from that pad of paper. No warrant was obtained prior to performing these scientific tests.

The defendant was charged by criminal information with one count of criminal solicitation of murder, in violation of § 11–1–9. Before his trial began, the state filed a motion *in limine* seeking to exclude evidence of defendant's previous acquittal of three counts of first-degree sexual assault. The defendant filed a written objection to this motion *pro se*, arguing that the trial justice should not allow the state to present evidence of these charges without permitting him to present the jury with evidence of his acquittal. The defendant also filed his own motion *in limine* to preclude the state from presenting evidence of these prior charges in the first place. The motion justice granted the state's motion and denied defendant's motion, explaining as follows:

"No one, no witness, no counsel, no pro se litigant will offer any witness, evidence, statement or argument that [defendant] was acquitted [of those charges]. I will instruct the jury if there's any reference to that case at all that it is totally irrelevant and immaterial as to whether or not that case has even been resolved, let alone what the result was. * * * You can't mention the outcome. That's the court's order. You can appeal me.

"* * *

"And my decision today, subject to reconsideration, is that I will allow, if the state offers, I will allow the state to provide motive evidence. I find that the motive evidence is prejudicial. However, I have also found that under the circumstances of this case, that preju-

---

4. This name, Susan, is also fictitious. Detective St. Clair testified that this correspondence received from Langston actually was a letter contained within a holiday card addressed to Donna from defendant. Susan did not know defendant personally, but recognized defendant's name from the prior inci-

dent with her sister. When Susan told her sister about the letter, Donna reacted with alarm and instructed her sister to destroy the letter. Instead, Susan contacted the Westerly Police Department and Det. St. Clair was given the correspondence.

dice is outweighed by probative value. I happen to weigh the equation differently than [defendant] as he sets forth in his written motion."

The motion justice similarly denied defendant's motion to suppress the products of the search of defendant's prison cell.

In addition to his motion *in limine,* defendant also filed, *pro se,* a motion to dismiss the criminal information against him for lack of probable cause pursuant to Rule 9.1 of the Superior Court Rules of Criminal Procedure. This motion was argued on May 16, 2003, at which time defendant maintained that the charges should be dismissed since Henriquez never received the solicitation letter. Despite noting the state's concession that Henriquez never did, in fact, receive the letter, the motion justice denied the motion, but admitted it was a close question.

The defendant's solicitation trial began on June 11, 2003. In its opening statement, the state wasted no time in referring to defendant's prior sexual assault charge. Defense counsel lodged no objection to this reference.

At the trial itself, the state presented numerous witnesses, three of whom testified to the relationship between defendant and Donna. First, in reference to the letter she gave to Det. St. Clair for analysis, Susan testified that she had knowledge of a prior incident between Donna and defendant. She stated that when she told Donna about the holiday greeting card from defendant, Donna "totally freaked. She said, burn it, bury it, I don't care." Susan also said that she knew there was a no-contact order between defendant and Donna. Detective St. Clair gave similar testimony. He stated that he was aware of a pending matter between defendant and Donna, and he confirmed the existence of a no-contact order between the two. Finally, in addition to testifying that he was aware of a no-contact order between

defendant and Donna, Investigator Mokler also said that, on the basis of what he had learned from Det. St. Clair, he entered defendant's prison cell at the ACI to uncover any information relating to Donna. Defense counsel did not object to any of this testimony.

After the state rested its case, defense counsel entered a motion for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. He leveled an identical argument to the one advanced pretrial in defendant's Rule 9.1 motion to dismiss. The trial justice again denied this motion.

The defense rested without presenting a case. In its closing argument, the state again referenced defendant's prior sexual assault charge. Defense counsel again did not object. In his charge to the jury, the trial justice cautioned the panel that "[r]emarks or statements or personal opinions expressed by counsel during the trial or during their final arguments are not evidence and they are not to be considered by you as evidence during your deliberations."

The jury returned a verdict of guilty for criminal solicitation. On July 21, 2003, defense counsel returned to the Superior Court to argue a motion for new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. He again maintained that criminal solicitation in Rhode Island required a completed communication, and since it was undisputed at his trial that Henriquez never received the letter, there could be no solicitation. Despite the state's again conceding that Henriquez was never in receipt of the letter, the trial justice eventually, although hesitantly, issued an order denying the motion for new trial.

## II

### Analysis

On appeal defendant advances three distinct points of error. First, defendant ar-

gues that the trial justice erred in denying various motions premised upon the legal theory that the state could not and did not prove the crime of solicitation because the intended solicitee never received the soliciting instrument. The next is an evidentiary matter: The defendant insists that the trial justice violated his due process rights by not allowing the jury to be presented with evidence of his prior acquittal of first-degree sexual assault. Finally, defendant maintains that the trial justice erred by denying his motions to suppress items seized from his prison cell in violation of both the Rhode Island and Federal Constitutions.

### A

### Criminal Solicitation

■■■ The defendant argues that the trial justice erred by denying his pretrial motion to dismiss, his motion for judgment of acquittal, and his motion for a new trial, by ruling that the crime of solicitation in Rhode Island does not require, as an element of the offense, that the communication actually be received by the intended recipient. On appeal, defendant urges this Court to find the statute ambiguous—specifically the word "another"—and that this ambiguity should have inured to his benefit at trial according to the rule of lenity. Not surprisingly, the state advances the contrary position. Because the issue presented is one of statutory interpretation, our review is *de novo*. *State v. Menard*, 888 A.2d 57, 60 (R.I.2005); *State v. Oliveira*, 882 A.2d 1097, 1110 (R.I.2005).

■■■ When called upon to review a statute, " 'our ultimate goal is to give effect to the General Assembly's intent. * * * The best evidence of such intent can be found in the plain language used in the statute.' " *Menard*, 888 A.2d at 60. " 'When the language of a statute is clear and unambiguous, we must enforce the statute as written by giving the words of

the statute their plain and ordinary meaning.' " *Gem Plumbing & Heating Co. v. Rossi*, 867 A.2d 796, 811 (R.I.2005). "[W]hen we examine an unambiguous statute, 'there is no room for statutory construction and we must apply the statute as written.' " *Menard*, 888 A.2d at 60 (quoting *State v. Santos*, 870 A.2d 1029, 1032 (R.I.2005)). Furthermore, "it is axiomatic that 'this Court will not broaden statutory provisions by judicial interpretation unless such interpretation is necessary and appropriate in carrying out the clear intent or defining the terms of the statute.' " *Id.* (quoting *Santos*, 870 A.2d at 1032).

Section 11–1–9 provides as follows:

"Every person who solicits another to commit or join in the commission of a felony under the laws of this state shall be guilty of a felony and upon conviction shall be subject to the same fine and imprisonment as pertain to the offense which the person did solicit another to commit, provided that imprisonment for the solicitation shall not exceed ten (10) years."

*State v. Rossi*, 520 A.2d 582 (R.I.1987), represents the only opportunity this Court has had to construe Rhode Island's criminal solicitation statute. In that case, the defendant was convicted of soliciting an eight-year-old girl to commit perjury by coaching her to identify the defendant's landlord as her sexual assailant rather than the defendant himself. *Id.* at 583. The defendant challenged his conviction, arguing that since the young girl could not have been guilty of perjury because of her status as a minor, he could not be guilty of soliciting her to commit that crime. *Id.* We disagreed and concluded that "[f]or the crime of solicitation to be completed, it is only necessary that the person solicit another to commit a crime." *Id.* However, *Rossi* did not give us occasion to entertain the question now before the Court, namely whether an illicit solicitation must be re-

ceived by the intended recipient to qualify as a punishable offense.

To support his interpretation, defendant cites several cases from other jurisdictions that purportedly have adopted his position on uncommunicated solicitations. The first of these are *State v. Cotton*, 109 N.M. 769, 790 P.2d 1050 (Ct.App.1990), and *State v. Lee*, 105 Or.App. 329, 804 P.2d 1208 (1991). Contrary to defendant's urging, however, we think that the logic employed in both *Cotton* and *Lee* makes each of these cases immaterial to our opinion in the case at bar. The New Mexico Court of Appeals in *Cotton* and the Oregon Court of Appeals in *Lee* each began by recognizing that its state's solicitation statute was motivated, at least in part, by the Model Penal Code.[5] *Cotton*, 790 P.2d at 1052–53; *Lee*, 804 P.2d at 1210. Each court found that because its state's legislature had opted not to adopt the second section of the pertinent Model Penal Code provision— the section that renders irrelevant whether or not a solicitation is actually communicated—there existed an implicit legislative intent to make receipt of the communication an element of criminal solicitation. *Cotton*, 790 P.2d at 1053; *Lee*, 804 P.2d at 1210. As an initial matter, the disparity in language between G.L.1956 § 11–1–9 and the Model Penal Code § 5.02 (Official Draft 1962) (MPC) convinces us that the Rhode Island criminal solicitation statute is not modeled after the MPC provision. In addition, there is no indication that our General Assembly specifically rejected—or even considered—subsection (2) of § 5.02 of the MPC's criminal solicitation definition. In the absence of such evidence, we cannot see how *Cotton* and *Lee* are instructive here.

The defendant next offers a California case in support of his argument. In *People v. Saephanh*, 80 Cal.App.4th 451, 94 Cal.Rptr.2d 910 (2000), the California Court of Appeals for the Fifth District was presented with a factual scenario that is nearly identical to the matter now before us. While in prison, the defendant in *Saephanh* was informed by a lady friend that she was pregnant with his child. Soon after, prison officials intercepted a letter authored by the defendant and addressed to an acquaintance requesting that the friend, with the assistance of others, cause the death of his unborn child by physically assaulting the pregnant woman. The defendant was charged with solicitation of murder,[6] and he was subsequently found guilty following a jury trial. The defendant claimed on appeal that there was insufficient evidence to convict him of solicitation since it was uncontested that his

---

5. The Model Penal Code (MPC), drafted by the American Law Institute in 1962, proposed the following definition of criminal solicitation, in pertinent part:

   "(1) *Definition of Solicitation.* A person is guilty of solicitation to commit a crime if with the purpose of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct that would constitute such crime or an attempt to commit such crime or would establish his complicity in its commission or attempted commission.

   "(2) *Uncommunicated Solicitation.* It is immaterial under Subsection (1) of this Section that the actor fails to communicate with the person he solicits to commit a crime if his conduct was designed to effect

such communication." Model Penal Code § 5.02 (Official Draft 1962).

   An explanatory note further explains that "Subsection (2) makes it immaterial that the actor failed to communicate his solicitation if his conduct was designed to effect such communication." *Id.* § 5.02 explanatory note.

6. California's criminal solicitation statute read, in pertinent part:

   "Every person who, with the intent that the crime be committed, solicits another to commit or join in the commission of murder shall be punished by imprisonment in the state prison for three, six, or nine years." Cal.Penal Code § 653f(b) (West 1999).

acquaintance never received the letter. *Id.* at 911–12.

The California Court of Appeals agreed with the defendant. First, the court disposed of both *Cotton* and *Lee*, citing the same reasons we set forth above:

"Section 653f, enacted in 1929, is not based on the [MPC]. * * * Thus, we disagree * * * that *Cotton* and *Lee* examined 'solicitation statutes similar to California's Penal Code section 653f,' at least in terms of legislative history and intent. We find *Cotton* and *Lee* unpersuasive on the issue of whether section 653f criminalizes the making of soliciting communications not received by the intended recipient." *Saephanh,* 94 Cal. Rptr.2d at 914.

Instead, the *Saephanh* court relied upon the express language of the California statute to hold that solicitation necessarily requires that the intended recipient actually receive the communication: "The plain language of section 653f, in particular the phrase 'solicits another,' demonstrates that proof the defendant's soliciting message was received by an intended recipient is required for liability to attach. * * * However, [no intended recipient] ever received the soliciting message. Thus, appellant did not solicit [any intended recipient]." *Saephanh,* 94 Cal.Rptr.2d at 915.

The state does not attempt to distinguish *Saephanh.* Instead, the state suggests that this Court adopt the reasoning of the New York Court of Appeals in *People v. Lubow,* 29 N.Y.2d 58, 323

N.Y.S.2d 829, 272 N.E.2d 331, 332 (1971), which held that the New York criminal solicitation statute encompassed uncommunicated solicitations.[7] A comparison of the New York solicitation statute at play in *Lubow* with Rhode Island's law, however, quickly dispatches the state's argument. According to the *Lubow* court's opinion, the New York statute provided, in pertinent part:

"that with intent that another person shall 'engage in conduct constituting a crime' the accused 'solicits, requests, commands, importunes *or otherwise attempts to cause such other person to engage in such conduct.*'" *Id.* 323 N.Y.S.2d 829, 272 N.E.2d at 332 (emphasis added).

In fact, the *Lubow* court specifically relied upon this attempt provision in concluding that criminal solicitation in New York proscribed even an uncommunicated solicitation. *Id.* The Rhode Island statute, on the other hand, contains no attempt language. *See* § 11–1–9. Thus, *Lubow* is simply unhelpful as to whether uncommunicated solicitations are illegal under statutes that do not expressly criminalize attempted solicitations.[8]

We think that, in accord with the California Court of Appeals in *Saephanh,* 94 Cal.Rptr.2d at 915, the plain language of § 11–1–9 clearly indicates that actual receipt of a criminal solicitation by an intended solicitee is required for liability to attach. Specifically, the phrase "solicits another" commands this result.[9] In the

---

**7.** The state also proposes that *State v. Bush,* 195 Mont. 475, 636 P.2d 849 (1981), is applicable here. At issue in that case was whether the crime of solicitation was completed if the intended solicitee was unaware of the criminal nature of the solicitation. *Id.* at 852. Because this question is unrelated to the issue before this Court, we find Bush inapplicable.

**8.** We think it only appropriate to note that the California Court of Appeals in *People v. Sae-*

*phanh,* 80 Cal.App.4th 451, 94 Cal.Rptr.2d 910, 914 (2000), reached the same conclusion with regard to the applicability of *People v. Lubow,* 29 N.Y.2d 58, 323 N.Y.S.2d 829, 272 N.E.2d 331 (1971), to a statute similar to Rhode Island's criminal solicitation law.

**9.** The defendant also argues that a 1994 Reenactment of G.L.1956 § 11–1–9, which allegedly altered the statute's text, further supports his proposed construction. Unfortunately,

present case, defendant sought to solicit his brother to kill a woman whose testimony might have landed defendant in prison for a lengthy stay. But his brother never received the message; therefore, no solicitation was made.

The state insists, however, that the crime of solicitation is complete when the request is made, regardless of whether the intended solicitee is ever actually in receipt of the communication. For support, the state points us to the MPC § 5.02 and commentaries. The state suggests that since we already have cited the MPC when previously construing § 11–1–9 in *Rossi*, 520 A.2d at 583–84, we are now constrained to interpret this same statute in accord with the MPC yet again. We disagree.

Our reference in *Rossi* to MPC § 5.04(1)(b) was nothing more than a note that the Court's holding was a view also supported by the drafters of the MPC. *Rossi*, 520 A.2d at 583–84. It certainly was not a wholesale adoption of the MPC's interpretation of what constitutes criminal solicitation. Indeed, it would be inappropriate for this Court to eschew the plain meaning of our own statute for that of another without the General Assembly's having enacted a provision akin to MPC § 5.02(2).

We point out that our decision herein concurs with the great weight of authority on this precise point. LaFave posits that "if the solicitor's message never reaches the person intended to be solicited, * * * [t]he act is nonetheless criminal, although it may be that the solicitor must be prosecuted for an *attempt to solicit* on such facts." 2 Wayne R. LaFave, *Substantive Criminal Law* § 11.1(c) at 198 (2d ed.2003) (emphasis added). In fact, the only support LaFave cites for an uncommunicated solicitation *not* being prosecuted as an attempt is MPC § 5.02, and a handful of state statutes promulgated pursuant to that provision. 2 LaFave, § 11.1(c) at 198 & n. 94; *see also* Haw.Rev.Stat. § 705–510 (1993); Kan. Stat. Ann. § 21–3303 (1995); Utah Code Ann. §§ 76–4–203, 76–4–204 (2003). Even the commentary to MPC § 5.02 admits that at common law "liability attached even though the communication failed to reach the party intended to be solicited, although generally in [this] instance the solicitor had to be prosecuted for an attempt to solicit." MPC § 5.02, Comment at 380–81; *see also* 21 Am. Jur.2d *Criminal Law* § 182 (1998) ("Completed communication between the actor and the person to be solicited must be proven to find the actor guilty of the crime of solicitation.").

Furthermore, the policies that motivate the proscription of solicitation support our interpretation. Criminal solicitation statutes such as § 11–1–9 have "the twofold purpose of protecting the inhabitants of [a state] from being exposed to inducement to commit or join in the commission of crimes and preventing solicita-

---

our review of the pertinent alterations to the text of § 11–1–9 reveals that the statute has not evolved as defendant suggests. Even if it had, however, his argument would be without merit.

A reenactment of a provision of the Rhode Island General Laws is undertaken by the law revision director, and whatever changes are made to the statutory text are not to be considered substantive, but stylistic only. *See* G.L.1956 § 43–4–18; G.L.1956 § 22–11–3.4. A statutory provision "is presumed to remain unchanged unless the specific proposed changes have been brought to the Legislature's attention," beyond merely presenting a reenacted volume to the General Assembly for a mechanical, sweeping approval. *In re Richard P.*, 451 A.2d 274, 276 (R.I.1982); *see also Oliveira v. Lombardi*, 794 A.2d 453, 457 n. 3 (R.I.2002). Therefore, we would have accorded no legal significance to any amended language in a typical reenactment of § 11–1–9. *Oliveira*, 794 A.2d at 457 n. 3.

tions from resulting in the commission of the crimes solicited." *Saephanh,* 94 Cal. Rptr.2d at 915. However, the threat of exposure to criminal inducements and the resulting danger of the actuation of criminal offenses become realized only upon receipt by an intended recipient. Because in the present case it is undisputed that Henriquez never received defendant's letter, there was no real threat that he would be induced to commit a criminal offense.

The state cites authority for the proposition that there is, in fact, another policy at play here. According to MPC § 5.02, Comment at 381, "[t]he crucial manifestation of dangerousness lies in the endeavor to communicate the incriminating message to another person, it being wholly fortuitous whether the message was actually received. Liability should attach, therefore, even though the message is not received by the contemplated recipient * * *." The state suggests, then, that defendant's conduct was culpable enough to warrant prosecution. We agree, but a prosecution for solicitation is not the proper vehicle.

As mentioned above, cases involving uncommunicated solicitations are typically prosecuted as attempts to solicit. *See* 2 LaFave, § 11.1(c); MPC § 5.02, Comment at 380–81; *see also* 21 Am.Jur.2d *Criminal Law* at § 182. And this makes sense: If we are to preserve the distinction between attempts and their choate counterparts, we simply cannot adopt the state's reasoning,

which essentially would raze the line between solicitation and attempted solicitation. The General Assembly has given no indication that this is its intent. Instead, the mere existence of G.L.1956 § 12–17–14 [10] indicates a clear legislative desire to maintain the inchoate/choate divide. This statute also provides the proper vehicle by which the defendant in this case could be prosecuted.

The plain language of both § 11–1–9 and § 12–17–14 clearly proscribe attempted solicitation. The evidence presented in this case would tend to prove that defendant authored a letter soliciting another to commit murder and proceeded to post that communication, which, in our opinion, represented "the last proximate act to effect communication with the party whom the actor [intended] to solicit * * *." MPC § 5.02, Comment at 381. Accordingly, we direct the entry of a judgment of acquittal for the crime of solicitation and remand this case for a new trial on the crime of attempted solicitation pursuant to § 11–1–9 and § 12–17–14.

## B

### Acquittal Evidence

The defendant next argues that the trial justice committed reversible error by permitting the prosecution to admit evidence of defendant's prior criminal charges for sexual assault, but refusing to allow the jury to be presented with the fact of his acquittal for those same charges.[11] In effect, defendant suggests

---

**10.** General Laws 1956 § 12–17–14 provides:

"Whenever any person is tried upon an indictment, information, or complaint and the court or jury, as the case may be, shall not be satisfied that he or she is guilty of the whole offense, but shall be satisfied that he or she is guilty of so much of the offense as shall substantially amount to an offense of a lower nature, or that the defendant did not complete the offense charged, but that he or she was guilty only of an attempt to commit the same offense, the court or jury may find him or her guilty of the lower

offense or guilty of an attempt to commit the offense, as the case may be, and the court shall proceed to sentence the person for the offense of which he or she shall be so found guilty, notwithstanding that the court had not otherwise jurisdiction of the offense."

**11.** While not entirely clear from his brief, defendant appears to argue that the admission of previous charges resulted in unfair prejudice. We disagree.

"The decision on whether evidence of other crimes is relevant to a permissible purpose is

that the cumulative effect of the state's evidence presented at his solicitation trial was to leave the jury ineluctably to infer that he was imprisoned as a result of a sexual assault perpetrated against the intended victim of the subject solicitation, thereby constituting damaging evidence of another crime which he was prohibited from impeaching with evidence of his acquittal. The defendant claims that our decision in *State v. Bernier*, 491 A.2d 1000 (R.I.1985), is dispositive on this point. We agree.

In *Bernier*, this Court held that a defendant must be permitted to present his or her acquittal of a crime when the trial justice has admitted evidence of that other offense. *Id.* at 1005–06. *Bernier* featured a defendant charged in two indictments with multiple counts of sexual assault, assault and one count of solicitation. *Id.* at 1001–02. During the trial the state elicited testimony from the alleged victim, over a defense objection, concerning a prior sexual assault. *Id.* at 1003. This evidence was admitted as probative of the "accused's 'lewd disposition or * * * intent' toward the victim." *Id.* at 1004 (quoting *State v. Jalette*, 119 R.I. 614, 627, 382 A.2d 526, 533 (1978)). The trial justice, however, forbade the defendant to introduce proof of his acquittal of that previous sexual assault. *Id.* at 1005. In vacating his conviction we instructed that the defendant's "acquittal in the [previous] trial was relevant and material evidence

that should have been presented to the jury." *Id.* at 1006. We commented further as follows:

"[W]e believe that the better rule would be to allow evidence of the acquittal [to be introduced] * * *. The admission of this evidence will give [a] defendant an opportunity to weaken or rebut the prosecution's evidence of other crimes. Permitting the jurors to hear such evidence will assist them in their assessment of the significance of the evidence of other criminal activity by knowing that at another time and place, a jury, considering [the] defendant's guilt or innocence of another crime, reached the conclusion that he or she was not guilty." *Id.* at 1005–06.

We concluded that the exclusion of this evidence "denied [the defendant] due process of law and as a result constituted error of constitutional dimensions." *Id.* at 1006. This Court has since reaffirmed and extended the logic of *Bernier* to include the admission of "[e]vidence of a prior acquittal of a co-indicted defendant (although not present at trial) in another state," *State v. Woods*, 544 A.2d 141, 144 (R.I.1988), and no true bills, *State v. Tobin*, 602 A.2d 528, 533 (R.I.1992). In all three scenarios, this evidence *must* be presented to the jury " 'either by stipulation, by the parties' testimony, or by an instruction from the trial justice.' " *Tobin*, 602 A.2d at 533.

left to the sound discretion of the trial justice." *State v. Lynch*, 854 A.2d 1022, 1040 (R.I.2004) (quoting *State v. Breen*, 767 A.2d 50, 58 (R.I.2001)). The trial justice did not abuse his discretion by permitting the fact of these other charges to enter as evidence. First, the fact that defendant was in prison at the time of the alleged solicitation on charges that he burglarized and sexually assaulted the intended victim of the solicitation is clearly and powerfully probative of motive, a recognized exception in Rule 404(b) of the Rhode Island Rules of Evidence. Second, the ab-

sence of any allusion to these other charges at trial would have created a palpable gap in the prosecution's narrative, leaving the factfinder without necessary information it ought to have had in order to be able to make an informed determination of innocence or guilt. *State v. Garcia*, 743 A.2d 1038, 1050–51 (R.I. 2000). Of course, as we conclude *infra*, once evidence of other criminal charges is admitted into evidence, a trial justice has a concomitant obligation to allow the jury to be presented with evidence of a defendant's acquittal of those charges.

Despite their seeming congruity, the state first insists that *Bernier* and the present case are distinguishable. We are pointed to three cases—*State v. Tobin*, 602 A.2d at 533, *State v. Marquis*, 588 A.2d 1053, 1056–57 (R.I.1991), and *State v. Grundy*, 582 A.2d 1166, 1171 (R.I.1990)— that allegedly support the state's position that a defendant has a right to present evidence of an acquittal for a prior crime only if that previous offense was identical or similar to the presently charged conduct. The express language of *Bernier*, however, contains no such limitation. We likewise discern no reason why *Bernier* should not apply in a case such as the one at bar, in which the evidence at issue was admitted as probative of motive, simply because the similarity between sexual assault and criminal solicitation was not what made this evidence probative.

The state is also quick to decry the applicability of *Bernier* to the present case, citing the simple fact that evidence of defendant's sexual assault charge was never presented to the jury, hence never triggering defendant's right to present his prior acquittal to the factfinder. Although the prosecution limited any reference to the charge to its opening statement and closing argument, Susan and Det. St. Clair testified about a "prior incident" between defendant and Donna, as well as the existence of a no-contact order between them; Investigator Mokler also testified to the no-contact order. The prosecution did stop short of eliciting from any witness any specific mention of the sexual assault or burglary charges, or the facts surrounding the incident.

*Bernier* made clear that a defendant's right to present acquittal evidence is triggered upon the admission of evidence suggesting the defendant committed another offense, the trial for which ultimately resulted in an acquittal. *Bernier*, 491 A.2d at 1005–06; *see also Hess v. State*, 20 P.3d 1121, 1125 (Alaska 2001) ("Even though the defendant's acquittal does not prove that he was innocent of the prior act, a jury may reasonably infer a greater probability of innocence from the fact of acquittal."); *People v. Griffin*, 66 Cal.2d 459, 58 Cal.Rptr. 107, 426 P.2d 507, 511 (1967) (noting that the admission of an acquittal in this context will assist "the jury in its assessment of the significance of the evidence of another crime * * *"). Recognizing this prerequisite, the state is clearly arguing that since comments made in opening statements and closing arguments are not evidence, and since the prosecution never elicited the fact of defendant's prior burglary or sexual assault charges during trial, defendant's right to present evidence of his acquittal on those charges was never triggered.

■ We think the state may have attempted to evade the protections of *Bernier* by burying any reference to defendant's prior charges in its opening statement and closing argument. Despite the trial justice's general instruction to the jury not to consider statements made in opening and closing arguments as evidence, the jury obviously was left with the unavoidable impression that defendant had sexually assaulted Donna, and the prospect of her testimony against him led defendant to write a solicitation of his brother to eliminate the only obstacle to his freedom. Although this Court is certainly aware that statements made in openings and closings are not considered evidence, *State v. Horton*, 871 A.2d 959, 965–66 (R.I.2005); *Bleau v. Wall*, 808 A.2d 637, 643 (R.I. 2002), we will not let the state circumvent a defendant's constitutional right to due process of law.

■ We conclude that the fact of defendant's acquittal of the sexual assault charges was "relevant and material evidence that should have been presented to

the jury." *Bernier*, 491 A.2d at 1006; *see also Tobin*, 602 A.2d at 533. Nor is the trial justice's error in excluding this evidence harmless "because we do not know what effect knowledge of the acquittal may have had on the jurors' deliberations." *Bernier*, 491 A.2d at 1006; *see also Tobin*, 602 A.2d at 533. The exclusion of evidence of defendant's acquittal denied him "due process of law and as a result constituted error of constitutional dimensions." *Bernier*, 491 A.2d at 1006; *Tobin*, 602 A.2d at 533. The defendant is, therefore, entitled to a new trial.

▉ The state argues in the alternative that defendant did not preserve this evidentiary challenge for appellate review because he failed to object to any evidence admitted or statements made by the state regarding defendant's previous encounter with Donna. The defendant retorts that his *pro se* written objection to the state's motion *in limine*, as well as his own motion *in limine*, were sufficient to preserve our review.

We repeatedly have expressed our view that a failure to object "in the vital context of the trial itself (except where the *in limine* ruling was unequivocally definitive) [constitutes] a waiver of the evidentiary objection and [is] therefore an issue that may not be raised on appeal." *State v. Kaner*, 876 A.2d 1133, 1134 n. 4 (R.I.2005) (mem.). Most recently, in *State v. Gomes*, 881 A.2d 97 (R.I.2005), we cautioned that "except when the *in limine* ruling is clearly *definitive*, it would at the very least be prudent for counsel to articulate the objection once again in the vital context of the trial itself." *Id.* at 108; *see also State v. Torres*, 787 A.2d 1214, 1220 (R.I.2002).

▉ The trial justice's *in limine* ruling in this case was unequivocally definitive. The precise language used bears repeating:

"No one, no witness, no counsel, no pro se litigant will offer any witness, evi-

dence, statement or argument that [defendant] was acquitted [of those charges]. I will instruct the jury if there's any reference to that case at all that it is totally irrelevant and immaterial as to whether or not that case has even been resolved, let alone what the result was. * * * You can't mention the outcome. That's the court's order. You can appeal me."

The trial justice did mention that his decision was "subject to reconsideration," but that was clearly in reference to his decision to allow evidence of defendant's prior charges, not his decision to deny defendant the ability to present the jury with evidence of his acquittal of those crimes. Furthermore, the phrase "[y]ou can appeal me" clearly indicates a certain finality. The effect of such a categorical ruling is to force a defendant to adapt his trial strategy to compensate for the loss of this valuable evidence, thereby lessening the likelihood that he will attempt to admit it at trial in contravention of the trial justice's clear order. We hold, therefore, that defendant's *pro se* objection to the state's motion *in limine*, as well as defendant's own motion *in limine*, were sufficient in this case to preserve this evidentiary objection for appellate review. We will, however, once again caution the bar as follows: A ruling on a motion *in limine*, unless unequivocally definitive, will not alone suffice to preserve an evidentiary issue for appellate review; a proper objection on the record at the trial itself is necessary.

## C

### The Cell Search

▉ Although we decide this appeal on the aforementioned grounds, we believe it prudent to address defendant's final claim of error as it will undoubtedly reprise at his new trial. He challenges the trial justice's denial of his motion to suppress per-

sonal papers and a yellow lined legal pad seized from his prison cell, claiming that the search and seizure constituted a violation of both article 1, section 6, of the Rhode Island Constitution and the Fourth Amendment to the United States Constitution. The defendant insists that the search of his prison cell and seizure of certain items served, in fact, as a pretextual ruse: What actually was a quest to stack yet another felony onto defendant's tally is now being justified as a search in the name of institutional security.

In this state, any discussion of a prisoner's legitimate expectation of privacy in his or her cell pursuant to article 1, section 6, or the Fourth Amendment must begin with this Court's decision in *State v. Wilmot*, 461 A.2d 401 (R.I.1983). Relying primarily upon dicta borrowed from the United States Supreme Court's opinion in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as well as several other federal decisions in accord, *Wilmot* held that "an inmate retains some residuum of Fourth Amendment protection." *Wilmot*, 461 A.2d at 406. We expounded that a prisoner "has a legitimate, though diminished, expectation of privacy in his cell and thus, limited protection of the Fourth Amendment, subject to the needs and exigencies of the prison environment." *Id.* at 407. "The need for discipline and security in the prisons and the inmates' diminished expectation of privacy require only that every search be reasonable and not undertaken for the purpose of harassing or humiliating an inmate." *Id. Wilmot*, however, addressed only the rights of convicted inmates and was silent on whether the analysis would differ if at issue instead were the rights of pretrial detainees.

In 1984, just one year after we decided *Wilmot*, the United States Supreme Court addressed head-on the issue of prisoners' Fourth Amendment rights in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In a five to four decision authored by Chief Justice Warren Burger, the Supreme Court held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* at 526, 104 S.Ct. 3194. Despite noting that a majority of the Federal Courts of Appeal had recognized a "minimal degree" of Fourth Amendment protection for inmates, *id.* at 522 n. 5, 104 S.Ct. 3194, the *Hudson* Court concluded that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his [or her] prison cell * * *," *id.* at 525–26, 104 S.Ct. 3194. As support for its conclusion, the *Hudson* Court cited the problems that prison violence, contraband and sanitation continually pose for the efficient and effective administration of detention facilities: "Virtually the only place inmates can conceal weapons, drugs, and other contraband is in their cells. Unfettered access to these cells by prison officials, thus, is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained." *Id.* at 527, 104 S.Ct. 3194. Thus, recognition of a Fourth Amendment right for convicted inmates in their cells would hamstring prison officials with warrant requirements that are entirely unnecessary given the suspension of rights that inevitably accompanies incarceration. *Id.* at 524, 104 S.Ct. 3194; *see also Wolfish*, 441 U.S. at 545, 99 S.Ct. 1861.

■ With respect to prisoners' rights, this Court has interpreted article 1, section 6, to parallel the Fourth Amendment. *Wilmot*, 461 A.2d at 405 n. 5. Furthermore, a " 'decision to depart from minimum standards [imposed by the Fourth Amendment] * * * should be made guardedly and should be supported by a principled rationale.' " *State v. Werner*, 615

A.2d 1010, 1014 (R.I.1992).[12] The *Hudson* decision, therefore, demands that we revisit the issue of whether there exists a constitutional proscription, to any degree, of unreasonable searches and seizures in our correctional institutions.

The precise issue before this Court, then, is whether either article 1, section 6, or the Fourth Amendment confers upon a pretrial detainee a legitimate expectation of privacy in his or her cell, especially when competent evidence suggests that he or she may be engaged in serious criminal activity in that cell. We are cognizant that *Hudson* left unanswered the question of whether a *pretrial detainee* should retain any legitimate expectation of privacy in his or her cell. A review of the post-*Hudson* decisions from various jurisdictions reveals a sharp split of opinion on this point.

A spattering of jurisdictions have found that a pretrial detainee *does* retain a legitimate expectation of privacy in his or her cell in the wake of *Hudson,* especially when the prosecution orders the search for the sole purpose of collecting evidence. *See, e.g., United States v. Cohen,* 796 F.2d 20, 22–24 (2d Cir.1986); *McCoy v. State,* 639 So.2d 163, 167 (Fla.Dist.Ct.App.1994); *Lowe v. State,* 203 Ga.App. 277, 416 S.E.2d 750, 752 (1992); *State v. Jackson,* 321 N.J.Super. 365, 729 A.2d 55, 63–65 (Law Div.1999).

A number of jurisdictions disagree, however, interpreting *Hudson* to hold that a pretrial detainee has no legitimate expectation of privacy in his or her prison cell, without regard for the purpose motivating the initial search. *See, e.g., State v. Apelt,* 176 Ariz. 349, 861 P.2d 634, 649 (1993); *People v. Davis,* 36 Cal.4th 510, 31 Cal. Rptr.3d 96, 115 P.3d 417, 429 (2005); *State v. Bolin,* 693 So.2d 583, 585 (Fla.Dist.Ct. App.1997), *rev'd on other grounds,* 793 So.2d 894 (Fla.2001); *State v. O'Rourke,* 792 A.2d 262, 267 (Me.2001); *People v. Phillips,* 219 Mich.App. 159, 555 N.W.2d 742, 743–44 (1996); *State v. Martin,* 322 N.C. 229, 367 S.E.2d 618, 621–22 (1988).

We agree with those jurisdictions that interpret *Hudson* to leave no room for any legitimate expectation of privacy for pretrial detainees regardless of the purpose motivating the search. We find persuasive the reasoning of the California Supreme Court when it recently held the same in *Davis,* 31 Cal.Rptr.3d 96, 115 P.3d at 428–29. First, the reasons cited by the *Hudson* majority in foreclosing upon a convict's Fourth Amendment rights—the safety of prison staff and visitors, the widespread proliferation of contraband, and prison sanitation—apply with equal force to pretrial detainees. The United States Supreme Court in *Wolfish,* 441 U.S. at 556–57, 99 S.Ct. 1861, virtually conceded as much: "It may well be argued that a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell and that therefore

**12.** *State v. Werner,* 615 A.2d 1010 (R.I.1992), provides a persuasive example of just how reluctant this Court is to depart from the federal interpretation of the Fourth Amendment to the United States Constitution when called upon to construe the protections of article 1, section 6, of the Rhode Island Constitution. In *State v. Benoit,* 417 A.2d 895, 899 (R.I.1980), this Court abandoned the Fourth Amendment's treatment of warrantless automobile searches, opting instead to make exigency essential before a warrantless automobile search could be commenced under article 1, section 6. After recognizing this departure in *Werner,* 615 A.2d at 1012, we proceeded to realign article 1, section 6, with the Fourth Amendment, noting that the United States Supreme Court had since "dissipated the gray cloud of uncertainty that once encompassed the issue of exigency." *Werner,* 615 A.2d at 1014. Therefore, absent any widespread uncertainty concerning the appropriate scope of Fourth Amendment protections, *Werner* demonstrates the appropriate deference we accord the federal interpretation when construing article 1, section 6.

the Fourth Amendment provides no protection for such a person." Indeed, in her concurring opinion in *Hudson*, Justice O'Connor suggested that it is "[t]he fact of arrest and incarceration [that] abates all legitimate Fourth Amendment privacy and possessory interests in personal effects * * *." *Hudson*, 468 U.S. at 538, 104 S.Ct. 3194 (O'Connor, J., concurring).

"Second, *Hudson* applies to jailhouse searches regardless of the purpose of the search." *Davis*, 31 Cal.Rptr.3d 96, 115 P.3d at 429. The motivation behind a cell search is simply irrelevant: A determination that a prisoner has no legitimate expectation of privacy in his or her cell because that space is subject to—and rightly so—both random and routine searches in the name of safety, security and sanitation is incompatible with the notion that the same prisoner somehow may reacquire a legitimate expectation of privacy in that cell depending on the motivation of prison officials in searching that space. We are confident that adequate safeguards exist to deter and remedy cell searches prompted by improper purposes. As observed by the *Hudson* majority, the availability of civil remedies and the protections of the Eighth Amendment to the United States Constitution are satisfactory weapons to combat intentionally menacing cell searches. *Hudson*, 468 U.S. at 530, 104 S.Ct. 3194. In addition, article 1, section 10, of the Rhode Island Constitution and the Sixth Amendment to the United States Constitution are effective tools to remedy violations of the right to counsel when and if seized materials contain protected communications. *See State v. Laurence*, 848 A.2d 238, 249 (R.I.2004).[13]

Furthermore, we think that preventing the commission of serious felonies within the jailhouse is a compelling reason to allow prison officials unfettered access to inmates' cells. Indeed, one of the several policies justifying incarceration is incapacitation—society's need to immediately curtail the criminal activities of certain individuals by placing them in an environment designed to restrict the various manifestations of their criminal proclivities. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.5(a)(2) (2d ed.2003). To ensure that true incapacitation is achieved, prison officials must have the proper tools at their disposal to effectively suspend *all* criminal activity within the jailhouse.

Finally, we decline defendant's invitation to interpret article 1, section 6, as according more stringent protections than the Fourth Amendment in the prison context. He cites *State v. von Bulow*, 475 A.2d 995 (R.I.1984), in which this Court exercised its right "as final interpreters of state law, 'to impose higher standards on searches and seizures than [those] required by the Federal Constitution,' even if the state constitutional provision is similar to the Fourth Amendment." *Id.* at 1019 (quoting *State v. Benoit*, 417 A.2d 895, 899 (R.I. 1980)). As we mentioned above, decisions to depart from the federal interpretation of the Fourth Amendment must be made guardedly, *Werner*, 615 A.2d at 1014, and we simply are not persuaded by the logic of decisions that would interpret *Hudson* not to apply to a factual scenario akin to the case at bar. *See, e.g., Cohen*, 796 F.2d at 22–24.[14]

The defendant argues alternatively that even if the search in this case was constitu-

---

**13.** The instant case is illustrative of how the constitutional right to counsel operates to protect privileged material seized in an otherwise permissible cell search. At trial, defendant successfully moved the court to preclude the state from divulging the contents of certain notations made on the seized legal pad because they were, according to the trial justice, clearly legal notes made in preparation

of his defense at the impending trial for burglary and the sexual assault of Donna.

**14.** We pause to note that, even under *State v. Wilmot*, 461 A.2d 401 (R.I.1983), the prison officials in this case would have been justified in conducting a warrantless search of defendant's prison cell. Assuming, *arguendo*, that *Wilmot's* holding extended to pretrial detain-

tional, the seizure certainly was not. We disagree. In *Hudson,* 468 U.S. at 528 n. 8, 104 S.Ct. 3194, the United States Supreme Court categorically dismissed this proposition:

"[T]he same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures. Prison officials must be free to seize from cells any articles which, in their view, disserve legitimate institutional interests."

We find the logic of the *Hudson* Court persuasive.

Therefore, we conclude that a pretrial detainee does not maintain a legitimate expectation of privacy in his or her cell. The search and seizure in this case were entirely permissible under article 1, section 6, and the Fourth Amendment.[15]

### Conclusion

For the foregoing reasons, we vacate the judgment of conviction against the defendant, direct the entry of a judgment of acquittal for the crime of solicitation and remand the case to the Superior Court for a new trial for the crime of attempted solicitation. The record shall be returned to the Superior Court.

ees, competent evidence suggesting that a serious felony was being committed within a prison cell easily would overcome whatever limited expectation of privacy defendant might have had in his cell to justify a warrantless search of the premises. *Wilmot,* 461 A.2d at 406–07.

**15.** The defendant further argues that the scientific analysis conducted on the legal pad and personal papers seized from his cell constituted an expanded search unsupported by a

warrant, and thus unconstitutional. *See State v. von Bulow,* 475 A.2d 995, 1015–20 (R.I. 1984) (discussing expanded scientific testing of seized materials). In light of our discussion above, however, we do not think it appropriate to comment at this time, without the benefit of a full record and briefing, on the issue of whether constitutionally unprotected items seized from a criminal defendant's prison cell only may be subjected to scientific testing once authorities have obtained a valid warrant.